| | |
|---|---|
| KYLE CAMERON | Case No. 2015-00580 |
| Plaintiff | Judge Patrick M. McGrath |
| v. | <u>DECISION</u> |
| UNIVERSITY OF TOLEDO | |
| Defendant | |

{¶1} Plaintiff brought this action for personal injuries alleged against the University of Toledo claiming negligence as well as a violation of R.C. 2307.44, Ohio's civil anti-hazing statute. The court denied both parties' motions for summary judgment. The case proceeded to trial on June 27-29, 2016. At trial, the parties presented 11 live-witnesses as well as 4 witnesses by way of deposition and also submitted multiple documents into evidence.

**<u>Statement of Facts</u>**

{¶2} Plaintiff was a freshman football player, recruited and given a scholarship, in 2011, to play for the University of Toledo. As part of an early conditioning process, all players (freshmen and upperclassmen) reported in June 2011 to the football stadium and locker facilities for summer conditioning sessions. Additionally, plaintiff was taking an introductory psychology course and an introduction to collegiate learning course. The summer sessions included weight training, conditioning drills/running, and skills/conditioning drills referred to as "metabolics." These sessions were voluntary, in that players were not required to attend, as such a requirement would violate NCAA regulations. Also, as required by the regulations, no coaching staff was present during the conditioning/skills or "metabolics." The freshman players stayed in dormitories during these summer conditioning sessions. The weight training included all players

which consisted of over 100 or more, separated into two groups by class year; an early morning session and a late morning session followed by a lunch break. Later, the players would go out onto the football field for running/conditioning which was followed by "metabolics" that were supervised and coordinated by upperclassmen. At the end of "metabolics" all players left for the day with the exception of some offensive linemen who lingered after for what has been described in the evidence as "The O-Line Challenge"; or the "Freshman Olympics." These "Olympics" were an unscripted series of contests run by some offensive line upperclassmen for the freshman offensive linemen (4-6 players), for the purpose of team building, camaraderie, and developing offensive line unity. They were designed to be fun, comical, and silly in the sense that the rather large offensive linemen would compete in games that in many ways resembled children's play activities all done with accompanying laughter, chiding, and calling-out by the upperclassmen reacting to the performance, or lack thereof, of the participants. The games included such things as a dance competition, wheelbarrow race, bear crawl, worm crawl, the gauntlet, kick a bag, tackle a bag, and a goal post crossbar dunk.

{¶3} It is during plaintiff's attempt to dunk a football over the goal post crossbar that he received his injuries. Plaintiff did not simply jump up and attempt to reach the crossbar. He decided to get a running start and step up onto another player's back and then leap for the crossbar. He succeeded in catching the crossbar but slipped off, falling backward to the ground, hitting his head.

**Plaintiff's First Cause of Action: Hazing**

{¶4} Plaintiff's hazing claim is based on Ohio's anti-hazing statute, R.C. 2307.44, which states, in part:

> Any person who is subjected to hazing, as defined in division (A) of
> section 2903.31 of the Revised Code, may commence a civil action for

injury or damages, including mental and physical pain and suffering, that result from the hazing.

\* \* \* If the hazing involves students in a \* \* \* university \* \* \* an action may also be brought against any administrator, employee, or faculty member of the \* \* \* university \* \* \* who **knew or reasonably should have known** of the hazing and who did not make reasonable attempts to prevent it and against the \* \* \* university \* \* \*.  (Emphasis added).

Pursuant to R.C. 2903.31, hazing is defined as:

\* \* \* [D]oing any act or **coercing** another, including the victim, to do any **act of initiation in any student or other organization** that causes or creates a **substantial risk of causing physical harm to any person**. (Emphasis added).

## Affirmative Defense

{¶5} Under R.C. 2307.44, as applied to University defendants, "it is an affirmative defense that the \* \* \* university \* \* \* was actively enforcing a policy against hazing at the time the cause of action arose."

{¶6} Defendant asserted the affirmative defense, arguing that it was actively enforcing an anti-hazing policy at the time of Mr. Cameron's injury.  It was clearly established during trial by testimony and submitted exhibits that the University of Toledo had an anti-hazing policy in effect at the time of the incident and that at least the upperclassmen involved in the "Olympics" should have been aware of the policy.

{¶7} Because the existence of an anti-hazing policy would be determinative of plaintiff's claim based on the anti-hazing statute, the court first will address the evidence presented as to that issue.

{¶8} Michelle Martinez Solis, the Dean of Students at the time of the incident, testified that there was an anti-hazing policy in effect at the time of the injury.  She testified that members of the football team, as student-athletes, are subject to the University of Toledo's Student Code of Conduct and therefore could face discipline should they violate the student's anti-hazing policy.

{¶9} The 2010-2011 Student-Athlete Handbook (Defendant's Ex. F) was distributed to the football players sometime in early fall of 2011, at the beginning of the school year. This is demonstrated by Defendant's Ex. G which contains the signatures of the players, including plaintiff, acknowledging they received the handbook. The "Code of Ethics" found on page 9 of the 2010-2011 Student-Athlete Handbook states that "Hazing will not be tolerated." The handbook goes on to define hazing as "the performing of an act or insisting that another perform an act for initiation which may cause or create an unnecessary risk to physical or mental health." The handbook states that "[s]tudent organizations found in violation of the University hazing policy shall be subject to the range of sanctions available to the University as outlined in the Student handbook." Further, Article IV, Rule 16 of The Student Code of Conduct (Defendant's Ex. H) specifically prohibits "[h]azing or the commission of any act that causes or creates a substantial risk of causing physical or mental harm to another."

{¶10} Plaintiff attempted to refute the defendant's position that it was enforcing its anti-hazing policy at the time of the injury through the testimony of several players who participated in the "Olympics," including plaintiff. None of the freshman participants were aware of the school's anti-hazing policy at the time of plaintiff's injury. This testimony is consistent with the fact that they did not receive the student handbook until after the injury. Brian Lutz, Associate Athletic Director, confirmed this fact when he testified that the specific anti-hazing policy with an effective date of February 2011 was not communicated to students until the beginning of the school year in August 2011, after plaintiff's injury.

{¶11} However, the upperclassmen involved in the "Olympics," including A.J. Lindeman and Mike VanDerMeulen, should have been aware of the existence of the school's anti-hazing policy. A year before plaintiff's injury, these student-athletes received the 2009-2010 Student-Athlete Handbook (Defendant's Ex. B) as evidenced by their signatures. (Defendant's Ex. C, pg. 135). A.J. Lindeman testified that he was not

aware of the existence of an anti-hazing policy at the time of plaintiff's injury. (Lindeman Dep., pg. 27). However, the court finds that given his signature acknowledging receipt of the handbook, he should have been aware. Even if he did not read the handbook, the school distributed the materials, and also took other measures to ensure that students were aware of the policy, as explained below. The 2009-2010 Handbook contained the same anti-hazing policy as the 2010-2011 edition.

{¶12} Moreover, Ms. Martinez Solis testified that there were several additional measures the school took to inform the student body about issues related to hazing, including: an email to the entire student body at the beginning of the school year explaining what hazing is; an anti-hazing week on campus, and a "myths of hazing" document used during that week. She addressed the football team directly in the fall semester. Although she did not specifically speak of hazing or the school's anti-hazing policy, she did discuss the Student Code of Conduct and possible repercussions for violations.

{¶13} Regarding enforcement of the policy, Ms. Martinez Solis testified that she took a personal, active role in enforcing the University's anti-hazing policy, including three particular incidents (among others that she did not describe in detail) in which she actively investigated allegations, including the personal investigation of an off-campus incident that occurred after midnight. She explained that she would come to hear of alleged incidents of hazing by word-of-mouth, or sometimes by way of a police report. When she received notice of possible hazing she conducted thorough investigations, which sometimes resulted in disciplinary measures for individuals and/or organizations. She testified that she never received any reports of alleged hazing on the football team or any other sports team. She stated that hazing is not restricted to Greek life and can occur on sports teams.

{¶14} The legislature offers little guidance regarding what it means to actively enforce an anti-hazing policy and there is little case law related to claims brought

pursuant to R.C. 2307.44. However, there is a substantial amount of evidence that defendant actively took steps to inform students, including football players, about hazing and the possible repercussions of hazing. The affirmative defense only requires the existence and active enforcement of a policy. The fact that the information regarding the policy distributed at the beginning of the school year and thus, after plaintiff's injury does not mean that the policy did not exist or was not being enforced. As established by the evidence, the upper classmen were informed of the policy and reasonably should have known of its existence. It is certainly not unreasonable to distribute the Student Handbook at the beginning of the school year on an annual basis. In light of Ms. Martinez Solis' testimony about her personal efforts to investigate claims of hazing and punish those found to have committed hazing, as well as a number of documents distributed to students regarding hazing, the court finds that the University of Toledo had an anti-hazing policy and was enforcing it in the summer of 2011. Therefore, the court finds that the affirmative defense applies in this case.

{¶15} Even if the court found that the affirmative defense did not apply, plaintiff has failed to establish that he was subjected to hazing as defined by R.C. 2903.31, as explained below. As stated above, the definition of hazing set forth in R.C. 2903.31 refers to any act "coercing" another * * * to do any act of "initiation" in any student or other organization that causes or creates a substantial risk of causing physical harm to any person. The evidence did not establish coercion.

**Coercion**

{¶16} Coercion is not defined by the statute, nor does the statute cite to a definition in another section of the Revised Code. However, since the definition of hazing comes from R.C. 2903.31, a criminal statute, the court will consider the definition for coercion found in another criminal statute.

{¶17} Pursuant to R.C. 2905.12, coercion includes the following: "threatening to commit any offense; threatening calumny; threatening to expose a matter tending to

subject a person to hatred, contempt, ridicule, or to damage their reputation; threatening criminal proceedings; and/or threatening to take or withhold official action."

{¶18} Coercion is also commonly defined as:

"Compulsion by physical force or threat of physical force." Coercion, *Black's Law Dictionary*, Seventh Edition (1999);

"To force to act or think in a given way by pressure, threats, or intimidation; To dominate or retrain forcibly; To bring about by force." Coerce, *Webster's II New College Dictionary* (1999).

{¶19} There is no evidence that the upperclassmen who organized and led the "Olympics" used any of the above-mentioned tactics to ensure participation from freshman players. There is no evidence of a threat of any kind made towards the plaintiff or any other player prior to or during the "Olympics." Also, none of the player-witnesses, including plaintiff, could cite to any specific repercussions for missing summer sessions, for instance, a decrease in playing time, revocation of scholarship, removal from team, or loss of any other potential benefit. The only possible repercussion suggested by plaintiff was that players had to do extra running if they missed the conditioning portion. However, that was not a punishment. Rather, it was to ensure the player did not fall behind as the other players' physical fitness improved.

{¶20} One player, Chris Castillo, testified that on one occasion he told the upperclassmen that he could not perform the wheelbarrow race because his arms were too tired from lifting. He said the upperclassmen told him to do it, and so he ultimately decided to participate. However, he did not testify that the upperclassmen threatened him in any way in order to force him against his will to participate, nor did he testify that he would be subject to any repercussion if he did not compete in the wheelbarrow race.

{¶21} Similarly, Robert Lisowski, a red-shirt freshman offensive lineman in 2011, testified that when he was a true freshman he chose not to perform the worm crawl and he suffered no consequences for choosing to sit out for that challenge. Also, he did not

believe the "Olympics" were hazing or that the "Olympics" or "metabolics" were mandatory. He said that the offensive line was a close-knit group like a family and the "Olympics" were simply created to instill that closeness, which would lead to better performance as a group.

{¶22} Plaintiff and his friends and roommates that he called as witnesses, testified that they felt pressured into participating in the "Olympics" and that they felt like they did not have a choice. The court finds that the peer pressure or teasing they described is not likely what the legislators intended when using the word "coercion" in the definition of hazing. They also testified that the rest of the summer activities, including weight training, conditioning, and "metabolics" were something that they had to do.

{¶23} Contrary to the testimony of plaintiff and his friends, all other witnesses testified that the above-mentioned summer activities were 100% voluntary. In fact, pursuant to NCAA bylaws, collegiate football teams cannot mandate participation during summer, before the official start of the pre-season. (Defendant's Ex. A). Plaintiff presented the position that the summer sessions were not voluntary because attendance was taken. Several witnesses presented unrebutted testimony that Rudy Wade, the strength and conditioning coach, and/or members of his staff took attendance during weight training/conditioning, and "metabolics." He also kept daily progress charts for student-athletes in the weight room. Rudy Wade testified that he was present during "metabolics" to ensure the players "stayed on task." Plaintiff asserts that this indicates participation in "metabolics" was mandatory. Plaintiff also testified that Rudy Wade would sometimes "get after" players, often using expletives in an intimidating manner if they were not staying on task during "metabolics." The court finds, by a preponderance of the evidence, that all of the summer activities, including "metabolics" were voluntary, as there was no evidence of meaningful repercussions for not attending.

{¶24} Even if the court found that weight lifting/conditioning and "metabolics" were mandatory, there was no evidence that attendance was taken during the "Olympics," or that Rudy Wade "got after" the players while they competed in the "Olympics." The injury did not occur during "metabolics"; it happened during the unplanned, player-organized "Olympics" and there is simply no evidence that any upperclassmen or Rudy Wade forced plaintiff to compete in the games.

{¶25} Plaintiff also maintains that the summer activities were not voluntary because the players followed a "script" of scheduled activities provided to the upperclassmen by the coaching staff and that "metabolics" were substantially similar to the activities performed during official practices supervised by coaches. (Plaintiff's Ex. 1-7). Essentially, he argues that there was little to no difference between "metabolics" which the university considered voluntary and fall pre-season practices which were mandatory. However, according to the athletic trainer, Jonathan Walters, "full contact" practice during the official season significantly differed from "metabolics" in that practices were mandatory, led by coaches, required pads/helmets, and also involved substantially increased physical intensity.

{¶26} Plaintiff also testified that he did not want to participate in the "Olympics" because he believed that the "Olympics" were not football activities and did not enhance the players' football careers, nor was it fun to compete in the games. He testified that he performed them because he was told he had to. He was told they were tradition and had gone on for at least five years or so. He recalled another freshman player, Chris Castillo, telling the upperclassmen that he did not want to participate one evening and the seniors goaded him into participating. He testified that he felt that new players had to go along with what the upperclassmen told them and since Rudy Wade was watching, the activities must be permitted and safe. He felt compelled to participate because he was an 18-year-old trying to fit in with 20-year-olds.

**{¶27}** Contrary to plaintiff's testimony regarding the purpose of the "Olympics" and the demeanor of the players involved, several student-athletes testified that the "Olympics" were fun, team-building exercises that helped to strengthen the relationship of the offensive line into a cohesive unit. Two other freshman players, Chase Nelson and Robert Lisowski testified in affidavits and on the stand that the "Olympics" were all about having fun. In fact, they specifically testified that plaintiff was laughing and having fun throughout the "Olympics." (Plaintiff's Ex. 27, 28).

**{¶28}** Some of the most convincing evidence that the "Olympics" did not involve coercion and were not hazing is found in the deposition of then-upperclassman, A.J. Lindeman. When asked if he was required to stay after "metabolics" finished, he said that "Nobody was forced * * * [or] required to be there. We all decided to stay after." (Lindeman Dep., pg. 14). He later explained, "It is how football works. A lot of people stay after to perfect your craft." (Lindeman Dep., pg. 16). When asked to describe everyone's demeanor during the games, he stated that, "they were games * * * they were all meant to be fun. From what I remember all the games were fun and everybody laughed." (Lindeman Dep., pg. 18-19). He explained that when he competed in the games as a freshman he found them to be fun and in no way demeaning or humiliating. (Lindeman Dep., pg. 19).

**{¶29}** Another player, Chase Nelson, transferred to the team in 2011 and was therefore considered a new player. He testified that he participated in the "Olympics" because he was told he had to because they were a tradition. Even though he testified that players would be teased or ribbed for not competing in the "Olympics," he ultimately considered the "Olympics" to be fun, team-building exercises.

**{¶30}** Likewise, Collin Perchinske, plaintiff's roommate, testified that even though he felt some pressure to participate because the freshmen before him had done so, he admitted that he competed in the "Olympics" (and the rest of the voluntary summer activities) to fit in and to become a better player.

{¶31} If the players, including the freshmen, were actively competing in the activities and were coerced into doing so, as plaintiff asserts, it seems highly improbable that they would later describe the "Olympics" as fun, team-building activities. Therefore, considering the overwhelming testimony describing the "Olympics" as voluntary and fun games, the court finds by a preponderance of the evidence that plaintiff was not coerced into participating.

**Initiation**

{¶32} Again, initiation into an organization is not defined by the statute. Defendant asserts that plaintiff could not have possibly been initiated into the football team by way of performing the "Olympics" because he was already an official member of the team. The evidence is clear that plaintiff signed his letter of intent in early spring of 2011 and became an official member of the team at that time. (Defendant's Ex. M).

{¶33} Initiation is commonly defined as:

"The rites, ceremonies, ordeals, or instructions with which one is made a member of a sect, or society (*esp.*, a secret society), a participant of mysteries, or esoteric teachings, or is invested with a particular function or status * * *" *Initiation*, *Merriam-Webster.com*. Merriam-Webster, n.d. Web. 23 Aug. 2016.[1]

{¶34} Even though plaintiff was already an official member of the team, the testimony is clear that he did not yet earn a spot in a particular position on the offensive line, or a starting role for that matter. Moreover, it was also well-established that the upperclassmen who ran the "Olympics" had no authority regarding a player's playing time, position, or status as a member of the team. Only the coaching staff had any authority regarding plaintiff's ability to play in a particular position on the offensive line or

---

[1]On page five of the June 7, 2016 decision regarding motions for summary judgment, the court addressed plaintiff's interpretation of the definition of initiation. Plaintiff argued that Rudy Wade admitted that the "Olympics" were hazing. However, the court found that Mr. Wade merely agreed that, based on plaintiff's counsel's vague and amorphous standard, the "Olympics" might be considered hazing.

obtain a starting position. There was absolutely no evidence that plaintiff's participation, or lack thereof, in the "Olympics" could somehow impact the coaches' decisions. Mr. Cameron was promised a chance to try out for a starting role on the offensive line. There is no evidence that any member of the coaching staff told him he had to participate in the "Olympics" in order to earn the starting center position, or in order to obtain any role on the offensive line as a starter or backup.

{¶35} If the act of initiation was interpreted as broadly as plaintiff envisions, essentially any time a member of any team moves to a new position, becomes a captain, or advances from one grade of accomplishment to another it could be considered an act of initiation.

{¶36} The court finds that the "Olympics" were not acts of initiation as plaintiff was already a member of the team. He was already exercising and practicing separately with the offensive line and there is no evidence that his participation in the "Olympics" had any effect whatsoever on his status as a team member or offensive lineman. Moreover, plaintiff has failed to establish other more material aspects of his hazing claim.

**Defendant's Knowledge of the Alleged Hazing**

{¶37} There is no question that Rudy Wade knew that the members of the offensive line were participating in the "Olympics" as he admitted he observed the players competing. Based on Coach Beckman's deposition and an abundance of testimony that the "Olympics" were occurring for years prior to Plaintiff's injury, the coaching staff was likely aware of their occurrence. Also, Peggy Cameron, plaintiff's mother, testified that Coach Beckman told her he and the offensive line coach were aware of the "Olympics" and that after plaintiff's injury, the team would put a stop to them. At the very least, Rudy Wade was certainly aware. However, plaintiff failed to establish that Mr. Wade, or any other employee of defendant knew or reasonably should have known that the "Olympics" involved hazing.

**{¶38}** Plaintiff admitted that he never told anyone that he thought he was being hazed by upperclassmen during the first few days of the "Olympics" or at any time after his injury. There is no evidence that any University employee was ever made aware of any alleged hazing on the football team at any time, related to the "Olympics," or otherwise. There is no evidence from which this court can infer that Rudy Wade, or any other member of the coaching staff, reasonably should have known that "Olympics" were a form of hazing. The "Olympics" were referred to by members of the coaching staff as well as both freshman and upper-class participants as merely fun, team-building exercises.

**{¶39}** There is no evidence that any University employee ever witnessed anything that could be described as coercion, or witnessed any upperclassmen forcing a freshman to participate in the "Olympics" against their will. From a non-participant's perspective, it would be nearly impossible to distinguish the "Olympics," as alleged hazing, from any other activity on the field during "metabolics." That is, the "Olympics" would appear to be activities performed by specific members of the team to establish camaraderie and team building before the official season begins.

**{¶40}** Plaintiff attempted to establish a culture of hazing on the University of Toledo football team. Players testified that freshmen had to carry the bags of upperclassmen and clean up the field. There was also testimony about the all-in club, in which awards were presented for 100% participation and 100% attendance.[2] There was testimony about freshman striping, in which freshman players had stripes on their helmets to designate them as freshmen, until coaches and player-mentors determined the player, based on performance, deserved to have their stripe removed. The mentor (an upperclassman) would then remove the stripe and give them a t-shirt which

---

[2]The court notes that the fact that an award was presented for 100% attendance does not weigh in favor of the summer sessions being mandatory, as plaintiff argues. Rather, the existence of an incentive and awarding the behavior seems to indicate the voluntary nature of the participation. If players were required to be there, awarding them for doing so would be pointless.

emphasized camaraderie and achievement. The court finds that there is no evidence of a culture of hazing on the University of Toledo football team at the time of plaintiff's injury. Singling out freshmen to perform certain somewhat menial tasks or distinguishing them from upperclassmen by placing stripes on their helmets does not meet the definition of hazing as set forth in R.C. 2903.31.

{¶41} The court is fully aware that hazing may exist at high school and collegiate levels and understands the purpose and need for Ohio's anti-hazing statue. Therefore, the court does not wish to mitigate the seriousness of hazing, nor does the court wish for this decision to be misconstrued as an acceptance of hazing. In the court's view, the games in the "Olympics" and the above-mentioned freshman-only activities were simply not hazing. The "Olympics," the all-in club, the striping ceremony, and the freshman-only activities were nothing more than aspects of team-building activities. If these activities are considered hazing then nearly every university in this state may be found in violation of Ohio's Anti-Hazing Statute for condoning similar conduct in regular practices and drills even though said activities are intended to produce nothing more than successful, close-knit collegiate sports teams.

**Substantial Risk of Harm**

{¶42} It is clear that most of the activities performed during the "Olympics" posed little to no threat of harm to the participants. Certainly, the wheelbarrow race, dance competition, bear crawl, and worm crawl are not dangerous activities. In fact, they likely posed a lesser risk of harm to plaintiff than full-contact practice or game scenarios.

{¶43} That being said, plaintiff contends that the goal post dunk was a dangerous activity. This assertion is somewhat corroborated by the testimony of Rudy Wade who stated in his deposition that the goal post dunk was a dangerous activity. However, it is not clear from the deposition whether Mr. Wade considered a goal post dunk in general to be a dangerous activity or only a dunk as performed by plaintiff, wherein the player runs and jumps off the back of another player launching themselves into the air in order

to reach the 10-foot height necessary to dunk the football over the crossbar.[3]  Likewise, Jonathan Walters, the athletic trainer, testified that the goal post dunk was dangerous and had he seen the players competing in the goal post dunk game he would have stopped them.  Again, it is not clear if Mr. Walters meant that he would have stopped the players if he saw them jumping off the backs of other players or if he considered a typical goal post dunk a dangerous enough activity to warrant intervention.  Brian Lutz, Associate Athletic Director, was more specific in his testimony that a 300-pound lineman running and jumping off of the back of another player to reach the height of the goal post is a dangerous activity.  The court finds that the specific manner in which plaintiff decided to perform the goal post dunk by running and leaping off of another player's back creates a potentially dangerous situation.

{¶44} Mr. Cameron could not recall any specifics regarding the moments that lead up to his injury, for instance whether or not he was told to jump off of another player's back.  According to testimony from upperclassman and freshman participants, no one told Mr. Cameron that he had to jump off of a fellow player's back to perform the dunk.  The decision was his alone.  There was testimony that Mr. Cameron may not have been the first player who chose to jump off of another player's back.  However, there is no evidence that the other player was told he had to do so.  Therefore, as further explained below in the section on assumption of the risk, the dangerous nature of the goal post dunk can be attributed to Mr. Cameron's decision to dunk in the particular manner he chose.  There was no evidence that the manner in which plaintiff chose to perform the dunk was a requirement of the event.

---

[3]While other members of the coaching were likely aware of the "Olympics," there is no evidence that they knew that the "Olympics" involved the goal post dunk, and more to the point, that the dunk could be accomplished by running and jumping off another's players back.

## Conclusion

**{¶45}** The court finds that plaintiff failed to establish any of the required elements of hazing as set forth in the anti-hazing statute. He failed to demonstrate that he was coerced into participating in an act of initiation which posed a substantial risk of physical harm and that the University of Toledo had knowledge of the occurrence of hazing.

## Plaintiff's Second Cause of Action: Negligence

**{¶46}** Plaintiff's second claim is based on, 1) Rudy Wade's failure to appropriately supervise and stop the "Olympics" in order to prevent plaintiff's injuries; 2) Jonathan Walter's failure to be present on the field at the time of the injury and also to stop the "Olympics"; and 3) defendant's failure to provide him with a helmet.

**{¶47}** To assert an actionable claim of negligence, plaintiff must prove, by a preponderance of the evidence, that defendant owed him a duty, that it breached that duty, and that defendant's breach proximately caused his injuries. *Armstrong v. Best Buy Co., Inc.*, 99 Ohio St. 3d 79, 2003-Ohio-2573, 788 N.E. 2d 1088, ¶ 8, citing *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St. 3d 75, 77, 472 N.E. 2d 707 (1984).

## Duty and Breach

**{¶48}** The duty element may be established by common law, statute, or by the particular circumstances in the case. *Chambers v. St. Mary's Sch.*, 82 Ohio St.3d 563, 1998-Ohio-184, 697 N.E.2d 198.

**{¶49}** In an effort to establish a duty owed to plaintiff by Rudy Wade, plaintiff submitted Rudy Wade's employment contract with the University of Toledo. In his position summary, the document states that one of Mr. Wade's duties is to "ensure the safety of our student athletes." (Plaintiff's Ex. 39, p. 2).

**{¶50}** John Walters had a similar duty regarding the safety of athletes in his contract, including protecting them from injury and illness. (Plaintiff's Ex. 10, p. 15).

{¶51} However, plaintiff has failed to establish that he was an intended beneficiary with enforceable rights in the contractual relationships between either Rudy Wade or John Walters. *See Hill v. Sonitrol of Sw. Ohio, Inc.*, 36 Ohio St.3d 36, 521 N.E.2d 780 (1988); *State ex rel. DeWine v. Mastergard*, 10th Dist. Franklin No. 14AP-1024, 2016-Ohio-660.

{¶52} Even if plaintiff had established that he had enforceable rights in the contacts, a breach of those contract does not inherently give rise to a negligence claim. "A breach of contract claim does not create a tort claim, and a tort claim based upon the same actions as those upon which a breach of contract claim is based exists only if the breaching party also breaches a duty owed separately from that duty created by the contract, that is, a duty owed even if no contract existed." *Prater v. Three-C Body Shop, Inc.*, 10th Dist. Franklin No. 01AP-950, 2002-Ohio-1458

{¶53} Additionally, plaintiff submitted NCAA bylaws which he believes establish, or at least should be considered as evidence of a duty owed to players. Mr. Waters, as the head athletic trainer for the football team, is granted "unchallenged authority," pursuant to NCAA bylaws, "to cancel or modify the workout for health and safety reasons." (Plaintiff's Ex. 19, p. 6).

{¶54} However, NCAA bylaws do not create a duty of care for negligence claims. *Pandey v. Banachowski*, 10th Dist. Franklin No. 11AP-459, 2011-Ohio-6830 (finding that a similar agreement between members of a voluntary organization, the realtor "code of ethics," does not establish duty for negligence claims).

{¶55} Even if NCAA bylaws did create a legal duty, such duty would only exist during the official, scheduled portions of the training, i.e. the weight training/conditioning and "metabolics." It is uncontested that the scheduled activities had ended for the day. Therefore, if such a duty existed, it did not apply to the "Olympics" which were organized by the upperclassman participants and not the NCAA member university.

{¶56} The duty of care, therefore, is not established by the employment contracts or NCAA bylaws. Likewise, there is no statute which relates to the standard of care owed to student-athletes.

{¶57} There is also very little case law establishing a common law duty of care for coaches to their respective players. This is likely due to the consistent application of the affirmative defense of primary assumption of risk. As stated above, the specific facts of the case may give rise to a duty of care. Rudy Wade admitted that he witnessed the players participating in the "Olympics," that he watched the offensive linemen dunking the ball over the goal post, and that he witnessed plaintiff run, jump off of another's players back and jump up to dunk the ball. He also admitted that this activity was dangerous and created a substantial risk of harm to plaintiff. Yet, he did nothing to stop the activity.

{¶58} As noted above, John Walters agreed with Mr. Wade's assessment and took it one step further; if he would have witnessed the players performing the goal post dunk, he would have stopped them. Rudy Wade could not recall seeing any other player jump off of another's players back to dunk the ball. He testified that the first person he saw perform the dunk in that manner was plaintiff.

{¶59} It is not clear when Mr. Wade developed the opinion that the goal post dunk was a dangerous activity, i.e. if he believed it was dangerous at any time prior to plaintiff's injury. However, the court finds by a preponderance of the evidence that the goal post dunk as performed by plaintiff was a dangerous activity and in light of the fact that Mr. Wade was the only representative of defendant present at the time, he was the only representative of defendant who could stop the activity.

{¶60} That being said, the court finds that the goal post dunk was only dangerous in the manner performed by plaintiff. The only time Mr. Wade saw it performed in that way was the time plaintiff got hurt. There is no evidence that Mr. Wade saw another player jump off of the back of a fellow athlete to dunk the ball. Mr. Wade saw the dunk

occurring in this dangerous manner as he stood on the sideline, not within close proximity to the players.  There was not a sufficient amount of time between the time the dangerous condition arose and the injury occurred for Mr. Wade to have stopped the activity and prevented the injury.  Therefore, even if a duty arose momentarily, the court finds that Mr. Wade's failure to prevent the injury was not unreasonable considering the circumstances.

{¶61} Also, as explained below, even if plaintiff established duty and breach, he did not establish that defendant's breach proximately caused his injuries.

## Causation

{¶62} As mentioned above, plaintiff claims that the University of Toledo was negligent for failing to provide him with a helmet, which would have mitigated or prevented his injuries.  However, this allegation is not consistent with that evidence presented at trial.

{¶63} Defendant's expert, Douglas E. Morr, P.E., offered unrebutted testimony that wearing a helmet would not have mitigated plaintiff's injuries.  His testimony was very clear and based on a significant background in research involving the efficacy of helmets in reducing injuries.  This research overwhelming suggests that while helmets play a significant role in preventing injuries, such as concussions, they have little to no effect on injuries caused by rotational-acceleration.  It is the significant rotational-acceleration forces upon plaintiff's brain that caused his injuries.  In fact, using computer simulation, Mr. Morr determined that plaintiff experienced forces far greater than anything he would experience during normal football play.  Mr. Morr testified that the forces are not effected by how high plaintiff jumped, or the speed at which he ran during his approach, they are effected by the height of his outreached arm (at least 10 feet), the angle of his body in relation to the ground, his weight, and gravity (which is a constant).  Therefore, no other factors effect Mr. Morr's decision, such as whether he held onto the goal post, and/or Mr. Morr's analysis of the ER doctor's notes or the notes

of the University physician who saw plaintiff after his injury. Consequently, even if plaintiff were wearing a helmet, it would not have prevented his injuries and due to the inherent limitations of helmets it could not have prevented the injuries caused by rotational-acceleration.

{¶64} The court finds Mr. Morr's testimony credible and agrees with the conclusion he reached based on the forces at play during plaintiff's fall and the limitation on helmets in general to prevent rotational-acceleration injuries. Plaintiff has failed to establish the element of causation as it pertains to his claim that the University's failure to provide him with a helmet caused his injuries.

{¶65} Likewise, plaintiff has failed to establish that the lack of a trainer on the field at the time of the injury was a proximate cause of said injury or that his injuries would have been mitigated had an athletic trainer been present. Jonathan Walters testified that he was not required to be present on the field by contract or by NCCA regulations. Even so, he was in the training room at the time, approximately 15 yards away from the field, and was on the scene just moments after plaintiff's fall. He immediately assessed the situation and determined that EMS was necessary and an ambulance was called to the field to take plaintiff to the emergency room.

{¶66} The court finds that the proximate cause of plaintiff's injuries was his decision to jump off of the back of another player, something which according to defendant's expert substantially increased the forces acting on his body when he fell and struck the playing surface. It was ultimately the height plaintiff achieved by using another player's back as a springboard, coupled with the angle at which he grasped the goal post crossbar, that caused his injuries. As noted above, no player or coach told Mr. Cameron that he needed to jump off of another player's back to perform the goal post dunk, nor did any agent of the university tell him he had to participate in the "Olympics."

**Primary Assumption of the Risk**

**{¶67}** Participation in sporting and recreational activities involve a risk of injury. Under, the doctrine of primary assumption of the risk, a participant is held to have assumed the ordinary risks inherent in the respective activity. *Schnetz, supra*; *Morgan v. Kent State Univ.*, 10th Dist. Franklin No. 15AP-685, 2016-Ohio-3303; *Crace v. Kent State Univ.*, 85 Ohio App.3d 534, 2009-Ohio-6898, 924 N.E.2d 906 (10th Dist.).

**{¶68}** When a plaintiff is found to have made a primary assumption of risk in a particular situation, that plaintiff is totally barred from recovery, as a matter of law. *Horvath v. Ish*, 134 Ohio St.3d 48, 2012-Ohio-5333, 979 N.E.2d 1246.

**{¶69}** "To be covered under the [primary-assumption-of-the-risk] doctrine, the risk must be one that is so inherent to the sport or activity that it cannot be eliminated." *Morgan,* at ¶ 13. Where the risk at issue is not inherent, then a negligence standard applies. *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 1996-Ohio-320, 659 N.E.2d 1232.

**{¶70}** Primary assumption of risk is a "defense of extraordinary strength * * *. Because a successful primary assumption of the risk defense means that the duty element of negligence is not established as a matter of law, the defense prevents plaintiff from even making a prima facie case." *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 431-432, 1996-Ohio-320, 659 N.E.2d 1232

**{¶71}** Plaintiff's position is that when he signed up to play football, he did not sign up to participate in the "Olympics," activities he viewed as having very little to do with becoming a better football player. However, it was well-established during trial that the "Olympics" were team-building activities meant to develop camaraderie. The activities may not have been a scheduled activity for the day and may not have led directly to any increased physical capacity related to the players' on-field performance. However, since they served a function related to the success of the offensive line and the team, the court finds that the "Olympics" are football activities. Accordingly, when plaintiff voluntarily chose to participate, more specifically, when he chose to run and jump off of

the back of another player to dunk the football over the goal post, he assumed the inherent risks associated with that choice.

**Conclusion**

**{¶72}** As it relates to his negligence claim, the court finds that plaintiff assumed the risk of injury associated with playing the sport of football and therefore, as a matter of law, he is prevented from recovering damages related to an injury sustained while participating in a football related activity.  As explained above, even if primary assumption of the risk did not apply in this case, plaintiff has failed to establish that defendant's actions or inaction proximately resulted in his injury.

**{¶73}** Regarding his hazing claim, the court finds that defendant had an anti-hazing policy in effect at the time of the injury and it was actively enforcing said policy. Therefore, plaintiff's claim that he was allegedly hazed is barred by defendant's affirmative defense.  Even if the court found that the affirmative defense does not apply, plaintiff has failed to establish that he was subjected to hazing as defined by R.C. 2903.31.

**{¶74}** Accordingly, judgment shall be rendered in favor of defendant.

PATRICK M. MCGRATH
Judge

[Cite as *Cameron v. Univ. of Toledo*, 2016-Ohio-8142.]

| KYLE CAMERON | Case No. 2015-00580 |
|---|---|
| Plaintiff | Judge Patrick M. McGrath |
| v. | <u>JUDGMENT ENTRY</u> |
| UNIVERSITY OF TOLEDO | |
| Defendant | |

{¶75} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
PATRICK M. MCGRATH
Judge

cc:

Guy T. Barone
405 Madison Avenue, Suite 1000
Toledo, Ohio 43604

Christopher P. Conomy
Emily Simmons Tapocsi
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed November 1, 2016**
**Sent to S.C. Reporter 12/15/16**